UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Dkt. No. 16-CR-10225-DPW |
| EDWARD J. TUTUNJIAN ) | |
| ) | |
| & ) | |
| ) | |
| EJT MANAGEMENT, INC. ) | |

### EDWARD J. TUTUNJIAN'S SENTENCING MEMORANDUM

**I. INTRODUCTION.**

Edward Tutunjian submits this memorandum as an aid in sentencing. For reasons detailed here, the defendant requests any combination of punishments other than imprisonment. One of the principal reasons for this below-guidelines sentence request is that a prison sentence would endanger Mr. Tutunjian's life and would certainly accelerate and worsen the severe complications of diabetes and hypertension which have already appeared. Mr. Tutunjian is remorseful about the harm that his crimes caused. This submission shows that Mr. Tutunjian is an unassuming, self-made businessman who began his career as a taxi driver. Unlike typical violators of these laws to which the guidelines apply, Mr. Tutunjian's crimes were not primarily motivated by greed. Mr. Tutunjian's crimes were the result of his use of illegal means to help immigrant employees. His many acts of personal kindness and generosity, and his six years of military service which began before he became a citizen and during the Vietnam War provide further reasons to impose a series of punishments that do not include a prison sentence.

1

## II. THE CHARACTERISTICS AND THE CIRCUMSTANCES OF THE OFFENSES, AND THE PLEA AGREEMENT.

Mr. Tutunjian fully accepts responsibility for the crimes set forth in the agreed statement of facts and guilty pleas that this Court has accepted. The offenses all involved the use of the cash revenue of Mr. Tutunjian's taxi and parking businesses from January 1, 2009 through May 31, 2013: **(1)** to evade payroll taxes and aid and abet some of his employees to evade taxes in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2; **(2)** to pay overtime at the employees' straight hourly rates in cash in violation of 29 U.S.C. §§ 207(a), 215(a)(2) and 216; and, **(3)** to compensate undocumented employees in violation of 8 U.S.C. §§ 1324a(a)(1)(a), 1324a(a)(2) and 1324a(f)(1). The cash payments at the straight rate for overtime provided employees with roughly the equivalent of payment by check at overtime rates. All of the employees at issue, except the undocumented immigrants, were paid partly by check and partly in cash. Agreed Statement of Facts (ASF) at 2. The guilty plea covers the 2009 tax year even though prosecution for that year is time-barred. Mr. Tutunjian did not exploit or benefit from the delay caused by grand jury litigation.

Virtually all of the employees who were involved in these crimes are immigrants. Many of them are green card holders or recently became citizens. Others were among the many millions of unauthorized aliens who live and work in this country.

Mr. Tutunjian immigrated to the United States as a Christian Armenian from Amman, Jordan. In addition to the Armenian genocide, which is central to Mr. Tutunjian's family history and consciousness, Jordan had been at war with Israel shortly before his family left the Middle East for the United States in 1966 during the Arab-Israeli conflicts.

Like Mr. Tutunjian, many of the employees are refugees from war- and poverty-torn countries and regions such as Ethiopia, Eritrea, Somalia and the Middle East.  Most of them do not speak or write English fluently.  The employees' countries of origin often do not have fully-functioning governments, and taxation is either non-existent or does not apply to incomes or employment.  Many of these employees asked to be paid in cash.  Mr. Tutunjian wrongly complied with these requests and applied it uniformly to EJT Management, Inc.'s ("EJT") non-management employees: mechanics, tow truck drivers, and parkers, whether requested to do so or not.

At all material times, Mr. Tutunjian also owned Boston Cab Dispatch, Inc. ("Boston Cab"), which is a "radio association" required and regulated by the City of Boston's Hackney Rules.  Passengers call Boston Cab by telephone and the company uses radio communications to dispatch taxis to provide transportation.  By contrast with EJT's mechanics, tow truck drivers and flag men, employees who worked for Boston Cab were primarily telephone/radio dispatchers whose responsibilities entailed verbal communications with the passenger public and drivers.  Those employees were paid in a similar hourly rate range as the mechanics, but they were not paid in cash.  In short, though Mr. Tutunjian applied the partial cash payroll method to EJT's non-managerial employees, he did not do so for others, including Boston Cab's employees, due to these cultural background differences.  If Mr. Tutunjian's motive for paying EJT's undocumented immigrant and green-card-holding employees in cash – and failing to report the cash payments to the IRS – was for financial gain or exploitation, Boston Cab would have engaged in the same activity.

Mr. Tutunjian's motive for illegal employment of undocumented persons was to help people who had no legal means of supporting themselves and their families.  These people were

not underpaid or exploited. For example, the Agreed Statement of Facts mentions an employee who was fired and re-hired briefly. ASF at 3. That unauthorized immigrant is a Brazilian man who worked for years as an unskilled data entry clerk (commonly a minimum wage job similar to a cashier). He was rehired because no one else at the company understood the software program that was used to record various aspects of taxi leasing transactions, and consequently he was needed to train replacements to perform his work. He had been paid $16 per hour and was paid a cash serverance, because he has a wife and two very young children who had lost their sole means of support. When asked several times before the grand jury whether he felt that he had been underpaid or exploited by Mr. Tutunjian, this man answered repeatedly that he had not been exploited.

The vast majority of offenders against these tax, labor and immigration laws are exclusively motivated by greed. That is not true in this case. Mr. Tutunjian's non-greed motive in no way excuses Mr. Tutunjian's crimes. His crimes financially harmed the government and compliant taxpayers, as well as impairing reliance on self-reporting, which is the foundation of our tax system. But the Court should take into account that Mr. Tutunjian's offenses were not motivated by desire for his own financial gain or to exploit employees.

The agreed statement of facts, plea agreement and presentence report state that the tax loss was $739,204 and that unpaid overtime wages were $349,859. In compliance with the plea agreement, and prior to sentencing, Mr. Tutunjian will pay the IRS $1,391,012, which includes the tax loss plus interest and a 75% penalty. He will also pay $699,718, which includes the unpaid overtime wages plus a 100% penalty. Thus Mr. Tutunjian will pay a total of $2,090,730 in restitution, interest and penalties.

The plea agreement and the presentence report state that the guideline sentencing range is 24-30 months at level 17.  As is true of many of the one-size-fits-all sentencing guidelines, the guideline range here does not distinguish between offenders who were exclusively or primarily motivated by financial gain and the unusual minority of offenders, like Mr. Tutunjian, who were not.

### III. EDWARD TUTUNJIAN'S CHARACTER AND EXPERIENCE.

#### A. Early History.

Mr. Tutunjian is descended from refugees who fled the Armenian Genocide and World War I violence by travelling south to Amman, Jordan.  His father died when he was a boy.  His education began in Amman, but life there was difficult for Armenian Christians.  Jordan was also a war zone during his childhood as a result of conflicts with Israel and violence between Arab tribes.

Mr. Tutunjian speaks Armenian, his family's native language.  He also has some facility with Turkish, because Armenians lived among the Turks before the genocide.  He also speaks and can read Arabic, which he learned as a school boy in Amman.  He is fluent in English, which he learned partly in Jordan and partly as an immigrant in this country.

At the age of seventeen, Mr. Tutunjian immigrated to the United States with his mother, his sister, and his younger brother.  He entered the United States on August 6, 1966, and moved with his family to Watertown, which has been a haven for Armenian immigrants for many years.  He graduated from Watertown High School in 1967.

#### B. Military Service.

Though he was still only a green card holder, Mr. Tutunjian enlisted in the Army Reserve on August 6, 1970, at the height of the war in Vietnam.  He did not become a naturalized citizen

until November 26, 1973. PSR at ¶ 74. He underwent 19 weeks of active duty training at Ft. Benning, Georgia and Ft. Knox, Kentucky, where he received commendations as an expert with M-14 and M-16 weapons. He was promoted to Private First Class on June 27, 1971. He received a certificate of appreciation for faithful service on August 21, 1971. He served six years in the Reserve, partly as a truck driver and partly in an intelligence unit, and was honorably discharged as a Sergeant on December 27, 1976. PSR at ¶ 88.

Mr. Tutunjian's patriotism and reciprocation by service to the nation that welcomed him and his family is evidenced by his voluntary enlistment and six years of Army service during the Vietnam War years. Mr. Tutunjian's regret and contrition about his crimes stems, in part, from his failure to adhere to the high patriotic standard he set for himself by serving in our military as a young man.

### C. Mr. Tutunjian's Character: His Compassionate and Charitable Acts.

The many support letters submitted with this memorandum confirm that Mr. Tutunjian is a soft-spoken man who speaks sparingly. Above all, he is a devoted husband, father, extended family member, church and community member, and friend. Many letters describe his acts of personal attention and kindness as well as his continuous, but quiet, generosity to individuals, to his church, to the Armenian community, and to the communities in which he has lived and worked. His extraordinary generosity and acts of goodwill towards others who are less fortunate are numerous but there are several that stand out. *See* Exhs. 1 - 4 generally.

Mr. Tutunjian's wife reports that she was attracted to him because, during a weekend social club retreat, he befriended another woman who, due to her difficult personality, was being ignored by others attending the retreat. Mr. Tutunjian went out of his way to welcome her and made sure to include this woman in the weekend's activities. He has helped many employees

over the years, and continues to employ a man who is cognitively impaired even though the man does not earn his pay. Ex. 4, pp. 1-6 (Nancy Tutunjian). His son and daughter report the many ways that Mr. Tutunjian helped both taxi drivers and his employees. Ex. 4, pp. 7-8 (Mary Tarpy) and Ex. 4, pp. 9-11 (Peter Tutunjian).

A number of years ago, when his own son was hospitalized with a serious illness, Mr. Tutunjian met a family from Jordan whose son was being treated for a rare and dangerous medical condition. This family was unable to obtain treatment for their son anywhere else and they were literally strangers in a foreign land with no place to stay. Mr. Tutunjian graciously offered them one of his apartments, where he allowed them to stay for more than ten years absolutely rent free so that their son could receive the treatment that he needed. Ex. 1, pp. 1-2.

On another occasion, the father of a family living in one of Mr. Tutunjian's rental units abandoned his family, leaving a mother and two young children behind. Mr. Tutunjian allowed them to stay rent free for eight months and personally paid their utility bills so that they would have electricity and heat. Ex. 1, p. 30.

In another instance, Mr. Tutunjian purposely purchased a dilapidated two-family home for so that he could create a job for a contractor friend who had fallen on hard times and whose two sons were going to have to drop out of college because he could not afford their tuition. The renovation project on the house lasted close to a year and the two boys were able to attend college. Ex. 1, pp. 28-29.

Mr. Tutunjian has sponsored many immigrants who were required to have employment as a condition of immigrating to the United States, including some who were taken in by him when they appeared on his doorstep without any notice. See Ex. 2, pp. 9-11; p. 28. Fisseha ("Fish") Siyoum came from Ethiopia to the United States via a green card lottery. He arrived in

Boston where he was to meet his sponsor, the cousin of a friend. However, it turned out that his sponsor had moved to another state. Not knowing what to do, Mr. Siyoum lived at Logan Airport for a week until someone told him that he should speak with a "Mr. Edward." Upon finding Mr. Tutunjian at the garage, and explaining to him where he had come from and that he needed a sponsor and a job, Mr. Tutunjian took Mr. Siyoum under his wing, finding a place for him to live and giving him a job. Mr. Siyoum has been working at the garage ever since. He has a wife and children, and he describes Mr. Tutunjian as the best boss anyone could ever have. Ex. 2, pp. 9-11.

    Mr. Tutunjian began in the taxi business by leasing and driving a cab. He worked very long hours, evening and weekends, while his friends were socializing and participating in recreational activities. Eventually, he saved enough money to buy his first medallion and cab. He performed most cab repairs and maintenance himself and eventually saved and borrowed enough money to buy another cab. Mr. Tutunjian has personally experienced cab driving and being an auto mechanic for years as an immigrant. Consequently, Mr. Tutunjian closely identifies – indeed over-identifies—with immigrant taxi drivers, auto mechanics and others who are challenged to provide for their families. Several letters confirm Mr. Tutunjian operated the taxi and parking businesses in a manner that indicates that he was always respectful and concerned for taxi drivers and employees who come from many different countries and members of many different ethnic groups and religions. It would be difficult to find a more racially, ethnically, religiously diverse workplace of relatively unskilled persons than Mr. Tutunjian's workplace. He has built an extraordinary atmosphere of friendliness and respect in that workplace that is not as common as it should be. *See* Ex. 2 generally (Letters from employees and cab drivers).

Far from being an exploitive employer, a letter from the manager of Mr. Tutunjian's Chilean properties, Rodrigo Abarzua states that even though these properties have never generated a profit, it is difficult to persuade Mr. Tutunjian to fire any of the approximately 200 Chilean employees, and that all of these employees kept their jobs even after an earthquake and other disasters devastated the local economy and thereby prevented the properties from growing income-producing crops and farm products. Ex. 2, pp. 21-24.

Mr. Tutunjian is described by EJT employees and drivers who lease cabs from him as respectful, generous, tolerant and caring. *See* Ex. 2 generally. Muslim drivers report that Mr. Tutunjian allocates space in the garage which they use to pray. That space is also used by former drivers who now drive for Uber, not the Tutunjian family. Ex. 2, pp. 6-7. Some have described the garage as being similar to the "United Nations," where a multitude of different nationalities, cultures and religions would congregate all for the purpose of providing a necessary transportation service to the City. Mr. Tutunjian cares about all of them. Ex. 2, p. 36. He would inquire about their wellbeing, eat many of his meals with them, and would visit them in the hospital when they were sick. Well known for his inability to say "No," Mr. Tutunjian routinely allowed drivers who were having trouble paying their cab leases to continue to lease and to pay late. He would tolerate difficult individuals and allow them to continue leasing from him because he knew that the driver might not be able lease a cab elsewhere. Other times he would not charge drivers for tickets they had received or would waive or split costs arising from an accident. He would often give money to employees who were experiencing financial difficulties without any expectation of repayment. *See* Ex. 2 generally.

Mr. Tutunjian's hard work and personal ability to develop a loyal and trusting customer base of taxi drivers who leased from his company led to steadily growing success. That success

was earned in a highly regulated taxi business in which the lease rates, passenger fares, and many additional expenses were set or required by the City of Boston. Between 2000 and 2009, he borrowed over $40 million from a bank to purchase medallions, which resulted in his ownership of a total of 372 medallions, 10 of which were sold in early 2014 for $700,000 each. That was the market price of medallion sales at about that time, as several other sellers obtained similar prices. The medallions no have no ascertainable value. His bank debt alone has been higher than $50 million and now stands at approximately $35 million.

### D. Recent History.

Recent events and experiences that have unfortunately resulted in a stark reversal of his past success are relevant at sentencing, because the stress Mr. Tutunjian has been living with for years has adversely affected his health.

In or about 2012, Uber and similar ride-sharing companies began competing illegally, without having to pay the acquisition costs of a medallion or other costs of equipping a taxicab that was compliant with city-issued rules and regulations. The illegal – and, until very recently, unregulated – competitors also under-priced the regulated industry's fares. The taxi market became over-saturated, adversely affecting the incomes of Hackney-licensed taxi drivers. This caused a sharp decrease in taxi leasing revenues and profits. This illegal competition caused lenders to freeze medallion acquisition financing and refinancing of existing medallion-based debt. Consequently, medallion values have cratered to the point where they have no ascertainable value. PSR at ¶¶ 95-96. *See* Ex. 5 (Declaration of Robert Kline); Ex. 6 (Jacen Dinoff Letter) & Ex. 7 (Joel Sklar Letter).

At the same time that the illegal ride-sharing companies began to compete in the Boston taxi market, Mr. Tutunjian, EJT, Boston Cab, as well as non-Tutunjian taxi fleet owners, were

sued in the Suffolk Superior Court by four drivers claiming to be representatives of all Boston taxi drivers who leased cabs in a putative class action. They claimed to have been misclassified as independent contractors and were entitled to treble back wages, overtime, workers compensation and unemployment insurance as misclassified employees. The damage claims against Mr. Tutunjian and his companies exceeded $200 million without interest.

The existential threat posed by this litigation and its costs caused enormous stress, but two other events in the spring of 2013 developed into three simultaneous storm heads. *The Boston Globe* published a Spotlight Series that misleadingly complained that Mr. Tutunjian's companies were exploiting drivers by extorting tips from drivers, making them pay for unneeded gas at the end of shifts, etc. The articles stemmed from the effort of plaintiffs' counsel in the putative class action to flank the complaints of a few disgruntled drivers with adverse publicity about Mr. Tutunjian. In reality, some, but not all, drivers paid tips to dispatchers to obtain a cab during pre-Uber periods when there were more drivers than available cabs. In fact, one of the alleged class representatives testified that he was still leasing Tutunjian cabs, as he had been for decades, and had never paid a tip to a dispatcher to get a cab at the start of his shift. "Q. Have you ever had to pay the dispatcher extra money at 4 o'clock in the afternoon to get a cab? A. Me, no." Deposition of Yves Bien-Aimee, May 13, 2013 at 117. The misleading accusations in the *Globe* series received extensive television and other media coverage, all of which caused Mr. Tutunjian to suffer heightened anxiety and damage to his reputation.

On May 31, 2013, teams of government agents and police officers executed search warrants at Mr. Tutunjian's business and at his residence and seized over 20 boxes of paper documents, as well as cell phones and huge quantities of electronic data. Within days, plaintiffs' counsel in the misclassification litigation obtained an asset freeze injunction issued by the

Suffolk Superior Court (Giles, J.) against Mr. Tutunjian and his companies. During that hearing, the presiding judge understandably relied heavily on the government search as a reason for preventing Mr. Tutunjian from engaging in any non-ordinary course transaction without prior court approval.[1]

As the impact of unregulated ride-sharing competition deepened, the bank cut off the businesses' line of credit and refused to extend the existing loan beyond its December 31, 2015 deadline. The bank agreed to allow Mr. Tutunjian to sell ten medallions, as previously mentioned, but then refused to allow further sales of its collateral, which would have enabled Mr. Tutunjian to reduce his enormous debt and debt service costs. Mr. Tutunjian engaged bankruptcy counsel and has been obliged to seriously consider filing for relief in the bankruptcy court. Eventually, the bank extended the loan until June 30, 2017, but at significantly higher interest rates and additional fees. Mr. and Mrs. Tutunjian had to collateralize the extended loan with virtually all of their assets, not just the medallions, as had been the case before these adverse events all struck at once. With the bank's consent, certain real estate assets were sold to fund the restitution, interest and penalties required by the plea agreement, and the capital gains taxes due from these sales.

Until April 21, 2015, Mr. Tutunjian was confronted by the federal criminal investigation, the devastating effects of illegal ride-sharing competition, and the misclassification litigation. On that date, the Massachusetts Supreme Judicial Court held that drivers who lease taxis in accordance with the City of Boston's Hackney Rules are properly classified as self-employed, independent contractors. *Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321 (2015). However,

---

[1] A*hmed Farah, et al. v. Edward J. Tutunjian, et al.*, Suffolk Superior Court, Dkt Nos. SUCV2012-00930 and SUCV2012-03430, June 18, 2013 Injunction Motion Hearing Transcript at p. 20. *See also* pp. 25-26.

since then, Mr. Tutunjian continued to remain under enormous stress as a result of the industry-wide threat that Uber and similar companies pose to the regulated taxi industry as well as his impending convictions and punishment in this case.  Mr. Tutunjian had hoped to reduce the debt by selling his Chilean properties.  Those properties have been marketed by a worldwide commercial real estate brokerage firm for a full year with no asking or minimum price.  No offers have been received.  The Chilean economy is not performing well and is not attractive to foreign investors. His properties are not saleable at present, because there is a worldwide over-supply of wine.  So there is no present prospect of using a sale of the Chilean properties to obtain debt relief.  *See* Ex. 8 (Affidavit of Felipe Bravo of CBRE).

### IV. MR. TUTUNJIAN'S DECLINING AND VULNERABLE HEALTH.

Mr. Tutunjian is 67 years old and in declining health.  Attached as Exhs. 9 & 10 are letters from his primary care physician, A. Donald Shushan, M.D. who is associated with Harvard Medical School-affiliated Mt. Auburn Hospital in Cambridge and Shanti S. Serdy, M.D., a Joslin Clinic diabetes specialist.  Also attached as Ex. 11 is the Declaration of Phillip S. Wise.  These documents prove the dangerous impact that a prison sentence would have on Mr. Tutunjian's life span and health.  At present, Mr. Tutunjian's precarious physical condition has already been compromised by diabetes complications and hypertension even with the skillfully-managed treatment regimen and frequent monitoring provided by his primary care physician and a Joslin Clinic diabetes specialist.  Since, according to the physicians' letters, stress is known to adversely affect diabetic control, Mr. Tutunjian's health has already suffered due to the above-described stresses experienced in the last four years.

These three submissions establish the following.

Dr. Shushan has been Mr. Tutunjian's primary care physician for many years. His October 25, 2016 letter reports that Mr. Tutunjian suffers from type II diabetes and hypertension, including multiple diabetes complications in several organs and systems. There are cataracts forming in his eyes that may require surgical treatment. He has been diagnosed with bilateral posterior vitreous detachments that may require laser surgery. He has recently been referred to a podiatrist for treatment of an ulceration on one of his feet, which is a sign of diabetic neuropathy and vascular disease. He has diminished ability to sense light touch in his feet, which is also a sign of neuropathy and compromised vascularization. His blood monitoring has shown loss of control of glucose levels in his blood, indicating worsening diabetic control. He has also had fluctuating prostate-specific antigen ("PSA") test results, which may indicate the onset of prostate cancer, and necessitates that Mr. Tutunjian's condition be monitored by a urologist. Diabetic men have an increased risk of suffering from prostate cancer. Dr. Shushan also reports stress and insomnia-induced, elevated blood pressure readings and weight fluctuations.

Dr. Serdy reports that Mr. Tutunjian's diabetes has been under excellent control for ten years and that his last reading at the Joslin Clinic was on July 7, 2016. Dr. Serdy prescribes three daily medications: Janumet 100mg/1000 mg each evening and metformin 500 mg each morning for diabetes; 81 mg aspirin for cardiac protection; and hydrochlorothiazide (HCTZ) 25 mg for hypertension. Mr. Tutunjian uses a prescribed device, a glucometer, on at least a daily basis to obtain a sample of his blood and measure glucose levels.

Both physicians emphasize the necessity of a low-carbohydrate and low-fat diet and regular exercise to prevent further diabetes complications, including compromised vision, decreased vascularization, neuropathy and neuropathic pain, worsening hypertension, as well as kidney and heart disease.

## V.     THE ADVERSE EFFECTS OF A PRISON SENTENCE.

Phillip S. Wise spent his career in various prison administrative positions and eventually as a Warden of several large U.S. Bureau of Prisons (BOP) facilities, including the Federal Medical Center in Rochester, Minnesota.  Prior to his retirement from the BOP in 2002, Mr. Wise also participated in the formulation of BOP health care policy as a member of the agency's executive staff in Washington, D.C.  The Wise Declaration (Ex. 11) includes the following information.

The BOP publishes its formulary of medicines that can be prescribed for prison inmates. See https://www.bop.gov/resources/pdfs/formulary.pdf. A diabetes drug prescribed for Mr. Tutunjian's diabetes, Janumet, which includes sitagliptin as a component, is not on the formulary's list. Ex. at ¶ 8.  This medication would be unavailable for Mr. Tutunjian's treatment if a prison sentence is imposed.  Losartan is prescribed for Mr. Tutunjian's hypertension. That drug is not listed in the BOP formulary either.  *Id*.

In pertinent part, Dr. Serdy's letter states her medical opinion that:

1. If the US Bureau of Prisons formulary precludes use of his current diabetes medications, necessitating a change in regimen, this could place Mr. Tutunjian at risk of hyperglycemia and hypoglycemia which could be life-threatening, and almost certainly deleterious to his long-term glycemic control and risk of diabetes-related vascular complications.

2. It is not assured that Mr. Tutunjian would be allowed to have a glucometer in prison, and lack of regular blood glucose monitoring increases the risk of severe hyperglycemia and hypoglycemia and above-noted complications.

3. It is not assured that Mr. Tutunjian would have access to routine healthcare monitoring including regular assessment by a medical professional with expertise in the care of diabetes, and lab monitoring as per the American Diabetes Association recommended standards of care.

4. As an elderly inmate, Mr. Tutunjian's symptoms of uncontrolled blood glucose levels could include lethargy, fatigue, and behavioral changes, which could be misinterpreted by non-medical staff as a correctional issue.

> 5. Physical and mental stress have been shown to have significant adverse effects on blood glucose control in persons with type 2 diabetes.
>
> In view of the above concerns regarding the adverse health consequences of incarceration, and as an advocate for my patient's health I ask the court to consider alternatives other than a prison sentence for Mr. Tutunjian.

Ex. 10 (Dr. Serdy Letter) at 2.

Dr. Shushan echoes Dr. Serdy's fears concerning the unavailability of the medications on which Mr. Tutunjian is dependent to preserve his already-compromised health. Dr. Shushan's letter also states his concern that the stress resulting from imprisonment, including disruption of Mr. Tutunjian's sleep cycles, "has been shown to increase the stress hormone Cortisol which in turn wreaks havoc with the patient's blood sugars." Ex.9 (Dr. Shushan Letter) at 1. Dr. Shushan shares Dr. Serdy's opinion, which he expresses "without doubt," that a prison sentence would have negative consequences for Mr. Tutunjian's health. *Id.*

Phillip Wise's Declaration provides significant additional information concerning the negative effects and risks to Mr. Tutunjian's health were he to be imprisoned in a BOP facility. Mr. Wise lists the BOP-related documents that he relies upon together with his familiarity with BOP policies and practices as well as conditions in BOP facilities. Ex.11 at ¶ 3. Mr. Wise states that Mr. Tutunjian does not qualify for designation to a BOP Medical Center and would be placed in a facility "without enhanced medical resources." *Id.* at ¶7.

Mr. Wise states that the BOP uses a computerized system to schedule necessary encounters between inmates and healthcare providers in a facility's chronic care clinic, and that this system would be used in Mr. Tutunjian's case. However, the Justice Department's Office of the Inspector General issued an audit report in 2008 that found that, in pertinent part, "about 16% of the time, inmates in these chronic care clinics did not receive the monitoring and follow-up

16

that was expected." *Id.* at ¶ 6 and fn.1. There is no published information that BOP's failure to meet its own standards of care has been rectified since the 2008 report. This is because a 2016 DOJ-OIG report describes the BOP's inability to hire and retain healthcare professionals. *Id.* at ¶ 14 and fn.4. A copy of the 2016 DOJ-OIG report is attached hereto as Ex. 12.

Mr. Tutunjian would be classified as an elderly inmate but, according to a 2015 audit by the Justice Department's Office of the Inspector General, the BOP is ill-equipped and its staff is not trained to meet the needs of elderly inmates. For example, due to overcrowding, there is a shortage of lower bunks that assure the safety of elderly inmates. Ex. 11 at ¶ 9 and fn.3. Mr. Wise also describes the stress-inducing challenges that Mr. Tutunjian would encounter in a BOP facility: over-crowding, regimentation, younger/more aggressive population, noise, fear of sanctions/inadvertently becoming involved, health care concerns, food, security requirements (strip searches, counts), bathrooms, sleep disturbances, and separation and limited communication. *Id*. at ¶ 17.

In sum, there can be no doubt that, due to his vulnerability to further and very harmful diabetic complications and hypertension, a prison sentence would hasten the worsening of existing complications and cause others. Indeed, any change in the drug treatment regimen prescribed by his physicians, in Dr. Serdy's words, "could be potentially life threatening, and almost certainly deleterious to his long-term glycemic control and risk of diabetes-related vascular complications."

### VI. RECOMMENDED SENTENCE.

We urge the Court to impose any combination of punishments other than a prison sentence. Such a sentence can include a combination of community confinement, home confinement, community service work, and fines within the guideline sentencing range. Such a

judgment would adequately serve all the purposes of sentencing, including general deterrence. (There is certainly no reason to believe that there is any risk of recidivism). Mr. Tutunjian has been living under the stress caused by this investigation for three and a half years. He and his corporation will have paid more than $2.3 million in restitution, back taxes, interest and penalties. The illegal practices ended more than three and half years ago and the company is now compliant. A series of additional punishments such as community confinement, home confinement, community service and fines should and would not be seen by potential offenders as a sentence that diminishes the seriousness of the offense or the interests in enforcing the laws that Mr. Tutunjian violated.

This sentence recommendation would not be understood by anyone as a broad ruling that elderly or ill offenders cannot or should never be imprisoned no matter the offense and no matter what other aggravating circumstances might exist. Mr. Tutunjian's case is a relatively rare one. The many letters submitted on his behalf overwhelmingly indicate that he has been sensitive to the needs and circumstances of others, and quietly performed many acts of personal kindness as well as financial generosity over many years. He is a patriotic American, who volunteered to serve in our military during war time and before he became a citizen. He served well and honorably for six years. In short, there is more than enough support in this record to impose a series of punishments that do not include a prison sentence. Mr. Tutunjian's life and health should not be jeopardized when several sufficiently punitive, alternative options to punish him severely are available. We urge the Court to impose a non-prison combination of punishments

that take into account Mr. Tutunjian's character, precarious health, and the need to deter others from committing his crimes.

DATED:  November 10, 2016

                          Respectfully submitted,

/s/Andrew Good
Andrew Good
MA BBO #201240
ag@gscboston.com

/s/*Philip G. Cormier*
Philip G. Cormier
MA BBO #554515
pc@gscboston.com

Good Schneider Cormier
83 Atlantic Avenue
Boston, MA 02110
Tel. 617-523-5933
Fax. 617-523-7554

*Counsel to Edward J. Tutunjian*

## CERTIFICATE OF SERVICE

     I hereby certify that I have this day served the within document on counsel of record via the ECF system.

Dated:  November 10, 2016                    */s/ Philip G. Cormier*
                                                 Philip G. Cormier